IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

EDDIE JOE HIGHTSHOE,

                   Plaintiff,

      v.

KILOLO KIJAKAZI, Acting Commissioner
of Social Security,[1]

                  Defendant.

OPINION AND ORDER

21-cv-31-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

      Plaintiff Eddie Joe Hightshoe is appealing a decision of the Acting Commissioner of Social Security denying his application for disability insurance benefits under the Social Security Act.  Plaintiff contends he is disabled from the residual effects of a traumatic brain injury, including visual disturbances, headaches, tinnitus, fatigue, and difficulty concentrating.  The administrative law judge (ALJ) who heard his case accepted that plaintiff had a number of significant limitations that prevented him from returning to his previous, high-level work as a sales manager, but found he nonetheless retained the ability to perform a range of light, unskilled jobs.  On appeal, plaintiff contends that the ALJ committed two errors that led her to determine a residual functional capacity for plaintiff that was not based on substantial evidence: (1) she did not properly evaluate plaintiff's testimony about his symptoms; and (2) she failed to properly evaluate the medical opinion evidence.  For the

---

[1]Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021, replacing the former commissioner, Andrew Saul.

reasons that follow, I find plaintiff's arguments unconvincing and will affirm the acting commissioner's decision.

The following facts are drawn from the administrative record (AR).

## BACKGROUND

### A. Social Security Application

Plaintiff filed a Title II application for a period of disability and disability benefits on April 30, 2018, when he was 48.  He alleged that he had become disabled on February 15, 2017, as a result of a traumatic brain injury he sustained when his car was hit by a logging truck.  At the time, plaintiff was working as a business development sales associate for US Foods, a job that required many hours of driving and computer work.

### B.  Medical Evidence

Two days after plaintiff's accident, he sought medical help at the Emergency Department at St. Luke's Hospital in Duluth, Minnesota, where he reported problems with concentration, sleeping, balance, and a feeling of pressure in his head and neck.  AR 408-09. He said he had initially had ringing in his head and tingling in his hand, but both of those problems had resolved themselves.  AR 409.

Plaintiff was advised that he had had a concussion and should return to the Emergency Department if he had any significant worsening of his symptoms.  AR 409-10. He was also advised to avoid electronics, bright lights, and loud noises for the first 24 hours

after he was discharged and resume activity gradually after he had been symptom-free for 24 hours.  AR 410.

For the next year and a half, plaintiff met with other medical consultants.  Dr. Timothy Morton, a physical and rehabilitation physician, saw plaintiff soon after his accident and on many occasions afterwards.  Throughout 2017 and into the first half of 2018, plaintiff complained to Dr. Morton about headaches, difficulty sleeping, numbness and tingling in his right hand, difficulty concentrating, and tinnitus.

Plaintiff worked with occupational therapist, Sara Sheppard, in late 2017 and 2018, on referral from Dr. Morton, with the goal of decreasing plaintiff's dizziness and to improve his eyeglasses so he would be able to spend more time on his computer and feel more comfortable driving in busy traffic.  AR 867-73.  Plaintiff told Sheppard that almost a year after his accident, he still found himself unable to function well for as long as five days, but he had found useful tools to decrease his tinnitus and his goal was to work on decreasing his headache symptoms.  Id.

Plaintiff also worked with a speech therapist, Peggy Stone, M.A., physical therapists, an audiologist, and other specialists.

### C. Medical Opinions

Dr. Morton thought it would be possible for plaintiff to return to work if he could have restricted duties, but did not think he could perform safely and consistently any of the jobs offered plaintiff by the company for whom he was working at the time of the accident.

AR 448. The doctor recommended that plaintiff stay off work and he renewed that recommendation frequently, encouraging plaintiff to continue with the physical, occupational, and psychological therapy he was receiving. Id. On October 5, 2018, Dr. Morton completed a "Report of Work Ability" form indicating that plaintiff should remain off work until reevaluated in one year, noting that plaintiff should follow up in neurology for his reported headaches. AR 1705. In March 2019, Dr. Morton stated after a drop-in visit with plaintiff that plaintiff would be unable to return to gainful employment because of the "oscillating nature of his daily symptoms," noting that plaintiff had done all he could to optimize his recovery but had reached maximum medical improvement. AR 1792-92.

In July 2017, five months after plaintiff's accident, Dr. Stephan Kaiser conducted a return-to-work evaluation of plaintiff at Dr. Morton's request. Dr. Kaiser was of the opinion that plaintiff could not return to his specific job at that time giving the significant amount of driving and computer work involved. Dr. Kasier noted that plaintiff had a large right shoulder labral tear which was limiting his use of his arm and was still dealing with visual difficulties that were not compatible with computer screen work. AR 1148-49.

Plaintiff saw Dr. Marcus Desmonde, Psy.D., for a psychological consultative examination on February 6, 2018, almost one year after his accident. Plaintiff said he had been unable to go back to work and drove only short distances and then only on country roads, because of his vision problems and slower reflexes. AR 528. After examining plaintiff, Desmonde's opinion was that plaintiff had mild to moderate limitations on his ability to understand, recall, and apply written and verbal instructions; moderate limitations in his

ability to interact with co-workers, supervisors and the general public; moderate to marked limitations in his ability to concentrate, persist and maintain pace; and moderate limitations in ability to manage his activities of daily living without reminders and assistance.  AR 530.

State agency psychological consultants who reviewed the record in connection with plaintiff's disability application concluded that, although plaintiff had some moderate mental limitations that would make it difficult to remember complex or detailed information, he was able to manage one-to-three-step simple instructions and handle simple routine work stress. AR 110-113, 139-141.  The consultants also concluded that plaintiff should have brief and superficial interaction with supervisors and coworkers.  One consultant wrote that plaintiff retained the ability to understand, sustain focus, "use his memory skills and relate to others well enough to adjust to simple rote occupational activity."  AR 1821.

### D.  Administrative Hearing

Plaintiff filed a claim for benefits based on both physical and mental problems. He alleged that he continued to have ongoing problems after his car accident, including pain, headaches, fatigue, tinnitus, irritability, depression, and issues with attention, focus, memory, and interactions with others.  AR 328-35.  After his claim was denied initially and on reconsideration, he moved for and was granted a hearing before an ALJ on February 27, 2020.  Plaintiff appeared with counsel and a vocational expert was present to discuss possible types of jobs plaintiff could perform.

Plaintiff testified that he and his former wife shared custody of their daughter, who was then eight years old, AR 53, and that he had maintained steady employment for many years before his accident.  When the accident occurred, he was working as a territory manager for U.S. Foods, overseeing sales people.  AR 56.

Plaintiff testified that since November 18, 2019, he had been working as a cashier and stocker at a Kwik Trip convenience store.  Plaintiff explained that he took the job because he needed health insurance for his daughter.  AR 78.  However, he said he was having difficulty working the full 40-45 hours a week for which he was scheduled.  He said he left work early at times and could only manage to work full days because he took more breaks than allowed, typically by spending extra time in the dairy cooler when it needed stocking.  AR 58.  Plaintiff said his biggest problems were mental fatigue, being around people, difficulty concentrating, headaches, and tinnitus.  AR 58, 60.  Plaintiff said the best place to get away was in the dairy cooler, where he could "hang out," close his eyes, and get his headaches and tinnitus down.  AR 58-59.  He was able to do this, he said, because he had been hired to transition into a management role, which meant he was not assigned to a particular cash register, where even a temporary absence would have been noticed.  AR 60.  He also said that he was usually in the cooler four to five times a day for 15 to 20 minutes, even though the cooler needed stocking only twice a day and could be done in about 10 minutes.  AR 75.  Plaintiff testified that he felt "terrible" at the end of a work day, AR 79, and he did not think he could continue at the job much longer.  AR 78.

Plaintiff's counsel asked him about volunteer work he had done for North Country Ride as a member of the board of directors for the organization.  AR 72.  Plaintiff explained that he had done this work on the advice of his therapist.  At the beginning, he helped take care of the grounds, stringing wire between fence posts, walking out horses for their riders, and generally helping out.  Later, he was asked to serve as a director, which he agreed to do.  AR 72-73.  He was unsure whether his  volunteer work had begun in April 2017 or the year after.  AR 75.

After plaintiff testified, the ALJ heard testimony from Bob Zadow, an impartial vocational expert.  The ALJ asked Zadow to consider a hypothetical that assumed an individual of plaintiff's age, education and work experience who could perform a range of work at the light level of exertion, and who had mental limitations restricting him to an unskilled work setting.  AR  85-86.  Zadow testified that such an individual would be unable to perform any of plaintiff's past work, all of which was skilled to semi-skilled.  However, said Zadow, such an individual could make a vocational adjustment to at least three unskilled jobs:  1) price marker and checker, DOT # 209.587-034;  2) mail sorter, DOT # 209.687-026; and 3) ticket seller and checker, DOT # 211.467-030.  For the first job, there were 271,000 jobs available in the national economy; for the second, there were 245,000 jobs; and for the third, 92,000 jobs.  Upon further questioning, Zadow testified that no competitive employment was available for an individual who, as a result of cognitive fatigue or psychologically-based symptoms, could not maintain concentration, persistence, and pace

for two-hour segments throughout an eight-hour day, or who would come into work late, need to leave early, take extra breaks, or be absent more than two days a month.  AR 86-87.

### E.  Post-Hearing Evidence

In April 2020, plaintiff's attorney submitted a post-hearing brief, which contained a copy of a letter from plaintiff giving Kwik Trip his two-weeks' notice.  AR 389.  Plaintiff stated that "personal issues [had] made it impossible" for him to continue employment, but did not elaborate.  Id.

The ALJ asked Kwik Trip to provide wage information and complete a work questionnaire about plaintiff.  In June 2020,  Kwik Trip submitted a cursory response confirming only that plaintiff had worked 45 hours a week as an "Assistant Store Lead" beginning on November 18, 2019 at the rate of $19.43 an hour.  AR 394.  The employer did not answer any other questions, including those asking whether plaintiff had received any special assistance, such as more breaks or absences.  AR 394.

The ALJ also asked for and received answers to medical interrogatories from Debra Pollack, M.D., a neurologist, about plaintiff's physical impairments and resulting work-related limitations.  AR 1866-74.

### F.  Administrative Law Judge's Decision

In deciding whether plaintiff was disabled, the ALJ followed the five-step sequential evaluation of disability set out by the regulations, 20 C.F.R. § 404.1520.  At step one, she

determined that when plaintiff worked at Kwik Trip from November 18, 2019 to April 2020, he had been engaged in substantial gainful activity, earning $19.43 an hour.  However, because there had been a 12-month period during which plaintiff was not engaged in substantial gainful activity (from the date of his accident on February 15, 2017 through the day before he started work at Kwik Trip in November 2019) and because plaintiff stated that he had stopped working in late April 2020, the ALJ proceeded with the sequential analysis.

At step two, the ALJ determined that plaintiff had the following severe impairments: (1) partial rotator cuff tear of right shoulder, status post arthroscopy, acromioplasty, distal clavicle excision and SLAP (repair of a cartilage tear in the inner part of the shoulder joint); (2) neurocognitive disorder secondary to traumatic brain injury with chronic headaches, vertigo, and tinnitus; (3) depression; (4) anxiety; and (5) post-traumatic stress disorder.  AR 20.

At step three, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  AR 21.  Reviewing the four "paragraph B" criteria relating to mental functioning, the ALJ found first that plaintiff had a mild to moderate limitation with respect to the first criterion: understanding, remembering, or applying information.  He could do tasks that consisted of multiple steps, including preparing simple meals, making small repairs, and doing yard work.  AR 23.  He managed his own money, regularly scored 29 out of 30 on mini-mental status examinations, displayed both an above average working memory and an accurate recollection of current information, and was

noted by his physical medicine provider to be an excellent historian and able to follow simple commands. AR 23. In addition, noted the ALJ, he had been able to work approximately 90 hours biweekly at a lower management job at Kwik Trip, and "only quit of his own will." AR 23.

As to the second criterion, interacting with others, the ALJ found plaintiff was only mildly limited. AR 23. Although plaintiff claimed he found it hard to converse with more than one person at a time and might develop a headache or ringing in his ears and lose focus if he was in a busy environment, trying to read a computer screen, or in bright lights, the ALJ did not find severe limitations in this area because plaintiff was able to visit with others, interact with health care providers and individuals at Kwik Trip, and take his daughter to restaurants, sports activities, and other public places. Id.

The ALJ assessed plaintiff as having a mild to moderate limitation in the third criterion of concentrating, persisting, and maintaining pace. She accepted his claim that the symptoms resulting from his traumatic brain injury interfered with his ability to pay attention and focus to some degree, noting that plaintiff had had neurophysiological evaluations showing some difficulties with sustained attention. She also noted, however, that while he had been a management trainee at Kwik Trip, he had been able to learn and work at various tasks. In addition, she noted that plaintiff was able to pay attention to movies, household chores, weekly shopping, and driving. AR 23.

Turning to the fourth criterion of adapting or managing oneself, the ALJ found that plaintiff had a mild to moderate limitation. She noted his testimony of having a depressed

10

mood, becoming irritable with others, and feeling fatigued most of the day, AR 23-24, but said that counselors and others who worked with him gave him high marks for motivation, he lived independently and cared for his personal needs, and took care of his daughter when she was with him.  Id.  In addition, his providers generally did not note problems attributable to psychologically-based symptoms, plaintiff had declined medication for symptoms of depression, and there was no evidence of psychiatric treatment, case management, or other related rehabilitative services.  AR 24.

Next, the ALJ determined plaintiff's residual functional capacity ("RFC"), concluding that plaintiff was capable of performing a range of light work.  AR 24-25.  Specifically, she found that plaintiff could:  lift or carry 10 pounds frequently, 20 pounds occasionally; stand and/or walk six hours; sit six hours; occasionally balance, stoop, kneel, crouch, and crawl; occasionally reach overhead bilaterally; never climb ladders, ropes, or scaffolds; frequently climb ramps and stairs; and never be exposed to hazards.  In addition, plaintiff was limited to a moderate noise environment.  With respect to mental limitations, the ALJ found that plaintiff had the mental ability to perform simple tasks and maintain concentration, persistence, and pace for two-hour work segments throughout an eight-hour workday and would be able to respond appropriately to the routine stressors found in an unskilled work setting.  AR 25.

In reaching these conclusions, the ALJ considered plaintiff's reported symptoms of constant headaches and ringing in his ears that interfered with his attention, focus, memory and interactions, as well as his reported mental fatigue, need for cognitive breaks in busier

11

environments, and difficulties interacting with others.  AR 25-26.  The ALJ concluded that although plaintiff's underlying impairments could be reasonably expected to produce these symptoms, they were not severe enough to prevent plaintiff from performing certain kinds of unskilled, light work, as outlined in the RFC.  In doing so, the ALJ carefully reviewed the objective medical evidence, noting that although plaintiff had extensive medical treatment in 2017, the year in which his accident occurred, and in the first part of 2018, there was little indication that he had any follow-up treatment after the fall of 2018.  AR 28.  She also noted that occupational and speech therapy records noted improvement in his tinnitus and headaches, much of his rehabilitation therapy was undertaken in an effort to enable him to return to his previous job responsibilities as the regional manager of a large operation, and his providers did not often observe the severity of the complaints plaintiff alleged.  AR 27-28.

The ALJ also found plaintiff's allegation of disabling limitations inconsistent with his work at Kwik Trip from November 2019 to April 2020.  AR 28-29.  The ALJ was skeptical of plaintiff's testimony that he took frequent, unauthorized breaks during the day where he did little work, noting that the testimony was inconsistent with his title of "assistant store lead" and his relatively high rate of pay.  In addition, Kwik Trip had not completed the portion of the questionnaire asking about work accommodations, leaving plaintiff's testimony uncorroborated.  AR 29.  The ALJ further noted that plaintiff's testimony that he rarely worked his scheduled 40 to 45 hours was inconsistent with his wage information and his having held the job for more than five months until he quit of his own will.  Id.  Also, noted the ALJ, plaintiff had provided no medical evidence to support his claim that his job made

his symptoms worse, and he still had been able to care for his daughter and take her out to eat on days he worked.  Id.  Finally, the ALJ pointed out that the work plaintiff did at Kwik Trip was more demanding than the ALJ's RFC determination.  Id.

The ALJ also considered plaintiff's activities of daily living, noting that he lived independently in a house, cared for his daughter half the time, cared for a dog, attended to his personal needs, enjoyed hobbies including going to the movies and hiking, and managed his home, including household chores, laundry, yard work, small repairs, and weekly shopping. AR 29.  Although the ALJ acknowledged that plaintiff said he could not complete these tasks every day and did not always complete what he started, she found that his varied and significant activities showed he could maintain attention, concentration, and persistence for two-hour segments throughout the day and respond appropriately to the stressors of unskilled work.  In addition, she discounted plaintiff's reported difficulties being around others, noting that he visited with others once or twice a month and took his daughter to sporting events, restaurants, and places in the community.  Id.

Finally, the ALJ considered the various medical opinions and prior administrative medical findings, including those of Dr. Morton and Dr. Kaiser.  With respect to plaintiff's mental functioning, the ALJ found the opinions of the state agency consultants and independent consultative examiner Marcus Desmonde partially persuasive. AR 30.  The ALJ agreed with the conclusion that plaintiff had the ability to understand, remember, and sustain performance of one to three step tasks, and deal with routine work stressors and changes.  Id. The ALJ found this assessment consistent with the medical record, which  showed mild

13

findings for plaintiff's cognition and some deficits in his concentration, as well as with his therapists' findings that he had the ability to maintain attention and concentration on simple tasks and his activities of daily living.  Id.  However, she  disagreed with the opinions of the consultants who would limit plaintiff to brief and superficial interaction with supervisors and coworkers, finding those opinions contradicted by plaintiff's ability to attend a number of sessions each week with his various therapists, interact with his providers, shop weekly, attend his daughter's activities, volunteer in the community, and work for over five months at a convenience store. Id.

At step four, the ALJ determined that plaintiff was unable to perform his past work, which was all semi-skilled or skilled.  At step five, however, relying on the vocational expert's testimony, the ALJ found that plaintiff was capable of making a vocational adjustment to a significant number of jobs in the national economy, and therefore he was not disabled.

## G. Appeals Council

Once the ALJ denied plaintiff's application for a finding of disability and disability insurance benefits, plaintiff requested review by the Appeals Council and his counsel filed a "motion for reversal," AR 400-04.  The Appeals Council denied the request for review, making the ALJ's decision the final decision of the Acting Commissioner of Social Security. Plaintiff then filed the present lawsuit.

OPINION

Under the holding in <u>Biestek v. Berryhill</u>, 139 S. Ct. 1148 (2019), this court must decide whether the ALJ's decision is supported by "sufficient evidence to support the agency's factual determinations." <u>Id</u>. at 1154. Doing so requires the court to determine whether the ALJ's decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," <u>id</u>., and also whether the ALJ has identified the evidence and built a "logical bridge" between it and the ultimate determination. <u>Moon v. Colvin</u>, 763 F.3d. 718, 721 (7th Cir. 2014).

As noted above, plaintiff challenges two aspects of the ALJ's opinion: (1) her evaluation of plaintiff's subjective symptom testimony; and (2) her evaluation of the medical opinion evidence.

## A. <u>Subjective Symptom Analysis</u>

Social Security Ruling 16-3p explains factors the ALJ is to consider in evaluating the intensity, persistence, and limiting effects of an individual's symptoms. 2017 WL 5180304 (Oct. 25, 2017); <u>see</u> <u>also</u> 20 C.F.R. § 404.1529. In addition to the medical evidence, the ALJ examines factors such as the claimant's daily activities, precipitating or aggravating factors, the claimant's course of treatment, including medication, and "any other factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms." <u>Id</u>. Notably, an ALJ "will not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation." SSR 16-3p, 2017 WL 5180304 at *11.

Instead, the ALJ should "focus on whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and . . . whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities." Id.

The court must defer to an ALJ's evaluation of a plaintiff's subjective complaints unless it is "patently wrong." Wilder v. Kijakazi, 22 F.4th 644, 653 (7th Cir. 2022). The question is whether the ALJ gives specific reasons for her evaluation that are supported by the record. Curvin v. Colvin, 778 F.3d 645, 651 (7th Cir. 2015). Here, the ALJ based her assessment on the medical findings, plaintiff's relative lack of treatment after the autumn of 2018, his five months' employment at Kwik Trip, and his activities of daily living.

Plaintiff first objects to the ALJ's consideration of his work at Kwik Trip. Plaintiff argues that the ALJ placed undue emphasis on his employment and failed to consider that it was an "unsuccessful work attempt" that should not have counted against his claim. As defendant points out, the "unsuccessful work attempt" issue typically arises at step one of the sequential analysis, when the ALJ considers whether there is any 12-month period without substantial gainful activity. Ordinarily, a claimant is found not disabled at step one of the sequential evaluation if he or she is doing substantial gainful activity, 20 C.F.R. § 404.1520(a)(4)(i), but the regulations carve out an exception for a work attempt that later proved unsuccessful. 20 C.F.R. § 404.1574(c). When, as in this case, the claimant worked more than three months but less than six, it is considered an unsuccessful work attempt if (1) it ended because of the claimant's impairments or because of the removal of special

conditions which took into account the impairment and allowed the claimant to work; and (2) one of the following is true:  (a) the claimant was frequently absent from work because of the impairment; (b) the work was unsatisfactory because of the impairment; (c) the claimant worked during a period of temporary remission of the impairment; or (d) the claimant worked under special conditions that were essential to performance and these conditions were removed.

In this case, the ALJ determined at step one that plaintiff's work at Kwik Trip from November 2019 to April 2020 constituted substantial gainful activity, but she proceeded with the sequential analysis because plaintiff had stopped working and there were more than 12 continuous months between plaintiff's alleged onset date of February 2017 and November 2019 when plaintiff engaged in no substantial gainful activity.  Plaintiff does not appear to take issue with the ALJ's determination that his earnings from November 2019 to April 2020 constituted substantial gainful activity.  Rather, he objects to the ALJ's reliance on his work activity at Kwik Trip as a basis for rejecting his allegations of disability at step four.  In plaintiff's view, the ALJ was required to apply the regulatory criteria for "unsuccessful work attempts" before relying on this evidence.  More specifically, he argues that the ALJ erred by failing to develop the record as required by SSR 84-25, which states, in part:

> In considering why a work effort ended or was reduced to the non-SGA level, we do not rely solely on information from the worker. Therefore, if impartial supporting evidence is not already a part of the claims file, confirmation with the employer is required. If the information from the employer is inconclusive or if none is available, the reason for work discontinuance or reduction may be confirmed with the person's physician or other medical source. After being apprised of the circumstances, the physician or other medical source could state

whether, in his or her opinion or according to the records, the work discontinuance or reduction was due to the impairment.

Plaintiff's argument is not well-taken. The ALJ *did* attempt to develop the record about his work at Kwik Trip, but Kwik Trip's response was inconclusive. Perhaps plaintiff means to suggest that the ALJ should have done more and contacted his physician, but he does not develop an argument to this effect. For the sake of completeness, however, I note that a plaintiff cannot succeed on a failure-to-develop-the-record claim without setting forth "specific, relevant facts" that the ALJ did not consider. Nelms v. Astrue, 553 F.3d 1093, 1098 (7th Cir. 2009). In this instance, plaintiff has not produced any evidence, such as a report from his doctor or from his employer, to corroborate his testimony that he performed poorly at Kwik Trip because of his impairments, with the result that his job ended. Without such evidence, plaintiff would be unable to show that he was prejudiced by any failure by the ALJ to develop the record.

The essence of plaintiff's claim is not so much that the ALJ did not develop the record, but rather that she did not fully credit his testimony that he was able to perform the job only because he took unauthorized breaks and had frequent absences. As previously noted, however, an ALJ's credibility findings are entitled to "special deference" and can be overturned only when "patently wrong." Summers v. Berryhill, 864 F.3d 523, 528 (7th Cir. 2017) (internal quotations and citation omitted). That standard is not met here. As the ALJ explained, plaintiff's claim that he had few actual duties was inconsistent with his job title and hourly wage, and his claim of frequent absences was not corroborated by his wage information or by his having left Kwik Trip of his own free will. AR 29. Moreover, plaintiff's

resignation letter did not specify that he was leaving for medical reasons, nor did he submit medical evidence to support such an allegation.  On this record, the ALJ could reasonably conclude that plaintiff was meeting his employer's expectations and that his job did not end because of his impairments.  Moreover, the mere fact that plaintiff worked out of necessity to provide health insurance for his daughter does not show that he could not perform the work.  Finally, as the ALJ noted, the demands of the work he performed at Kwik Trip were greater than those allowed by the ALJ's ultimate RFC assessment.  For all these reasons, I find no error by the ALJ in relying on plaintiff's ability to work for five months at Kwik Trip as a reason to discount his allegations of total disability.

Next, plaintiff argues that the ALJ erred in relying on his daily activities without considering the difference between the activities he performed in his own home at his own pace and the kind of activities performed in a competitive work environment.  This argument is not persuasive.  Contrary to plaintiff's suggestion, the ALJ did not equate plaintiff's daily activities with an ability to perform full time work.  Rather, she identified specific activities and contrasted them with plaintiff's own statements about his limitations.  For example, the ALJ contrasted plaintiff's statement that he had difficulties being around people with his ability to visit with others one to two times a month, attend his daughter's gymnastic events, and take his daughter to restaurants or an aquarium.  The ALJ contrasted plaintiff's statement that he lacked focus and attention for more than 30 minutes with his reported hobbies of going to movies and hiking.  She also noted that plaintiff was able to complete various household tasks and activities such as driving, grocery shopping, small repairs and chores such

as laundry and yard work that were inconsistent with his assertion that "he is not able to sustain any concentration for tasks." AR 29. Because the ALJ's reliance on plaintiff's daily activities for this purpose was proper and her findings are adequately supported by the record, this court has no basis on which to reverse it her finding. SSR 16-3p, 2017 WL 5180304 (permitting consideration of daily activities as a factor in evaluating a claimant's subjective statements about her symptoms); Beardsley v. Colvin, 758 F .3d 834, 838 (7th Cir. 2014) (explaining "it is proper for the Social Security Administration to consider a claimant's daily activities in judging disability," but still "urg[ing] caution in equating these activities with the challenges of daily employment in a competitive environment").

Finally, plaintiff accuses the ALJ of "cherry picking" the medical evidence and ignoring objective evidence in the record that tends to support his complaints, such as evidence contained within a report by Edgar Angelone, Ph.D., suggesting that plaintiff is not a malingerer. Br. in Supp., dkt. #6, at 27-28. However, the ALJ considered Angelone's report. As she accurately pointed out, Angelone's report was not persuasive on the issue of disability because Angelone prepared his report in connection with a civil suit and did not offer any specific residual work-related limitations resulting from plaintiff's deficits. AR 31. Plaintiff does not challenge this conclusion but merely says the ALJ was not thorough enough. However, an ALJ need not discuss every piece of evidence in the record. Terry v. Astrue, 580 F.3d 471, 477 (7th Cir. 2009). Contrary to plaintiff's suggestion, the ALJ thoroughly and carefully reviewed the record and did not ignore any lines of evidence. Because the ALJ gave

specific reasons for her credibility determination that are supported by the record, I must defer to it.

### B. Evaluation of Medical Opinion Evidence

Plaintiff contends that the ALJ erred in failing to properly evaluate the medical opinion evidence.  In considering this contention, the new regulations govern, which means that the ALJ is not to give deference to any "medical opinion(s) or prior administrative medical finding(s), including those from [the plaintiff's] medical sources." 20 C.F.R. § 404.1520c(a). As under the prior rules, the ALJ is to consider a number of factors in evaluating each opinion's persuasiveness, including supportability, consistency, the provider's speciality and relationship with the claimant, with supportability and consistency being the most important. Id.  Finally, although ALJs must discuss in their decisions how persuasive they find the various medical opinions and prior administrative medical findings, they need only explain how they considered the supportability and consistency factors; discussion of the other factors is optional unless two medical opinions are otherwise equally persuasive.  Id.

Plaintiff focuses on the ALJ's decision with respect to Dr. Morton, plaintiff's physical medicine provider.  In March 2019, after a drop-in visit with plaintiff involving no physical examination, Dr. Morton stated that plaintiff would be unable to return to gainful employment because of the "oscillating nature of his daily symptoms."  The ALJ found this opinion unpersuasive for the following reasons:  (1) it was inconsistent with the doctor's last examination of plaintiff in October 2018, which the ALJ described as "normal;" (2) it was

inconsistent with plaintiff's minimal treatment at the time; (3) it was inconsistent with plaintiff's activities of daily living and subsequent full time work; and (4) it was a statement on an issue reserved to the commissioner.  AR 31.

Contrary to plaintiff's argument, all of these reasons withstand scrutiny.  Although plaintiff insists that Morton's "most recent examination" supported his opinion, the evidence he cites consists only of plaintiff's own subjective statements during his drop-in visit with the doctor.  Br. in Supp., dkt. #6, at 24.  An ALJ need not credit a doctor's opinion if it relies solely on the patient's subjective allegations.  Bates v. Colvin, 736 F.3d 1093, 1100 (7th Cir. 2013) ("where a treating physician's opinion is based on the claimant's subjective complaints, the ALJ may discount it").  Moreover, the smattering of abnormal clinical findings that plaintiff cites from other records appear to relate to his shoulder impairment, not to the post-concussive symptoms that plaintiff claims prevent him from working.  As the ALJ properly observed, Dr. Morton's March 2019 note was not accompanied by any objective findings and his previous note, from October 2018, indicated that plaintiff had  no obvious confusion, no processing delay, and was able to focus on the conversation.  AR 1707. Earlier in the decision, the ALJ noted that Dr. Morton had observed plaintiff to be a good to excellent historian who was capable of following simple commands.  This lack of clinical support, along with plaintiff's minimal treatment, daily activities and later ability to work full time, were ample reasons for the ALJ to discount Morton's March 2019 opinion that plaintiff could not perform gainful work.

Plaintiff challenges the ALJ's findings with respect to a handful of other opinions, but he has not shown that the ALJ erred or why it would make a difference.  For example, he argues that the ALJ erred in rejecting Dr. Kaiser's opinion, offered five months after plaintiff's car accident, that plaintiff should not do prolonged driving or computer office work, and would have difficulties with keyboarding.  However, he does not suggest that any of the jobs identified by the vocational expert would involve such tasks.  (He makes this suggestion on reply, but that is too late.  Wonsey v. City of Chi., 940 F.3d 394, 398 (7th Cir. 2019) ("[A]rguments raised for the first time in a reply brief are waived.")  In any case, his cursory argument on reply is unpersuasive.)  Moreover, as the ALJ pointed out, plaintiff later reported being able to drive for two to four hours at a time and watch movies.

Similarly, plaintiff appears to object to the ALJ's rejection of his speech therapist's opinion in February 2018 that plaintiff was unable to return to work, but he does not dispute the ALJ's finding that the therapist was referring to "fairly complex tasks," whereas the ALJ's RFC limited plaintiff to "simple tasks."  Finally, he argues that the ALJ erred in rejecting the opinions of Desmonde and the state agency consultants, who indicated that plaintiff had moderate limitations in his ability to interact with others such that he should be limited to brief and superficial contact with supervisors and coworkers.  However, as the ALJ pointed out, this opinion was inconsistent with evidence that plaintiff attended a number of therapies several times a week and was able to interact with his providers, volunteered in the community, attended his daughter's activities, shopped on a weekly basis, and was able to work for more than five months at a convenience store.  Resolving this evidentiary conflict

was a task for the ALJ, not this court.  Because the ALJ sufficiently articulated her rationale and those reasons are substantially supported by the record, I find no error in her assessment of plaintiff's social limitations.

## C.  Conclusion

As noted at the beginning of this opinion, this court's task is not to determine whether plaintiff is disabled, but only whether substantial evidence supports the ALJ's determination that he is not disabled.  Having conducted a critical review of the evidence, I am persuaded that the ALJ considered all of the important evidence of record and articulated sufficiently her rationale for finding some evidence more persuasive than other evidence.  It is understandable that plaintiff would have wanted to return to a former job at which he had excelled, and it is unfortunate for him that he cannot do so.  To be entitled to social security disability benefits, however, he must demonstrate that he lacks the ability to perform any kind of work existing in substantial numbers in the national economy.  Here, reasonable people could agree that plaintiff did not meet that burden in light of his work at Kwik Trip, the relative lack of medical treatment he had after 2018, the objective medical evidence, his varied and substantial daily activities, and the medical evidence suggesting that much of his rehabilitation therapy was undertaken in an effort to enable him to return to his previous job responsibilities as the regional manager of a large operation.  Accordingly, I must affirm the ALJ's decision.

.

24

ORDER

IT IS ORDERED that the decision of Kilolo Kijakazai, Acting Commissioner of Social Security, denying plaintiff's application for a period of disability and disability insurance benefits is AFFIRMED.

Entered this 7th day of June, 2022.

BY THE COURT:

/s/

_____

BARBARA B. CRABB
District Judge